## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

MacKENZIE MORLEY,

                Plaintiff,

v.                                  CIVIL ACTION NO.  3:22-0375

ENERGY SERVICES OF AMERICA CORP.,
a West Virginia corporation, and
C.J. HUGHES CONSTRUCTION CO., INC.,
a domestic corporation and wholly owned
subsidiary of ESOA,

### MEMORANDUM OPINION AND ORDER

      Pending are the Motion for Summary Judgment by Defendants Energy Services of America Corp., CJ. Hughes Construction Co., and Douglas V. Reynolds (ECF No. 120), and Plaintiff's Motion for Summary Judgment on Counts II and III of Second Amended Complaint (ECF No. 122). The parties appeared before the Court for oral argument on the pending motions on December 21, 2022. For the reasons that follow, Defendants' motion is **GRANTED in part and DENIED in part**, and Plaintiff's motion is **DENIED**.

## I.   FACTUAL BACKGROUND[1]

### C.J. Hughes, Energy Services of America, and MacKenzie Morley

      C.J. Hughes is a "pipeline construction contractor with over 75 years['] experience in the natural gas, petroleum, water, wastewater, [and] sewer industries." Morley Dep. 40:20–22. [2] C.J.

---

[1]  This section provides a brief summary of the hundreds of pages of evidence submitted by the parties.

[2]  The parties largely cite to the deposition transcripts of the same individuals. Unfortunately, neither side has provided the full transcript of any of the cited depositions and

Hughes was acquired by its parent company, Energy Services of America Corp. ("ESOA" or "ESA"), in 2008. Crimmel Dep. 14:13–17; Reynolds Dep. 16:16–17. Defendant Doug Reynolds is the president and CEO of ESA and the corporate treasurer of C.J. Hughes. Reynolds Dep. 5:11–19.

In April 2020, Charles "Chuck" Austin became the president of C.J. Hughes. Austin Dep. 9:5–13. It was known Austin would be assume the role of president months in advance, and in late 2019, Austin started looking for a business development and marketing director. *See* Austin Dep. 9:1–10; Morley Dep. 25:1–18. Morley and Austin had lunch together to discuss the role. Morley Dep. 25:1–18. By November 13, 2019, C.J. Hughes officially offered Morley employment as its Marketing Director. Offer Letter, ECF No. 120-5. Morley was to start her position on January 6, 2020, and would earn an annual salary of $95,000. *Id.* at 2. Morley accepted the position on November 14, 2019. *Id.* at 3.

In January 2020, Morley received an employee handbook. Morley Dep. 69:19-20.[3] Morley also signed several acknowledgments. Most of those acknowledgments referenced her employment with C.J. Hughes. *See* Wireless Comm. Device Policy, ECF No. 120-8, at 2; Right to Work Acknowledgment, ECF No. 128-8, at 4; Equipment Issuance Agreement, ECF No.120-8, at 5. However, the antidiscrimination policy which Morley received and signed on January 6, 2020, mentioned only ESA. EEO Policy, ECF No 120-8, at 3.  That policy explains ESA's, rather than C.J. Hughes', commitment to maintaining a positive work environment. According to the signed

_____

instead have provided different portions of each individual deposition as exhibits. For the purposes of clarity, instead of referring to the different ECF documents each time a portion of a deposition transcript is cited, the Court will cite to the page and line of the transcript.

[3] Morley testified that she did not read it "cover to cover". Morley Dep. 69:23–70:1.

policy, should an employee be concerned about conduct in her workplace, she could report her concerns "without fear of retaliation" through one of the following channels:

- "A direct-level or successively higher-level supervisor/manager"

- "An ESA Human Resources Representative"

- "Any manager with whom the individual is comfortable."

EEO Policy. The policy does not reference "C.J. Hughes" once; though, an almost identical C.J. Hughes policy is included in the employee handbook submitted by the Defendants. Safety & HR Manual, ECF No. 120-7.

There is not an official definition of Morley's role that is cited by either side of this litigation, but it is agreed that part of her duties included developing business for C.J. Hughes, maintaining relationships with existing customers, and speaking at events on behalf of the company. *See* Morley Dep. 40:3–5, 55:16–12; Austin Dep. 12:6–9.

When she started at C.J. Hughes, Morley reported directly to the company's president. Morley Dep. 32:11–14. Accordingly, from the time she was onboarded in January 2020, she reported to then president, Rick Phillips, and when Austin assumed the role of president, she reported to him. *Id.*[4]

**Pay Dispute**

In February 2022, C.J. Hughes hired Kevin Sanders. Sanders Dep. 8:11–16. Sanders had worked in the construction and gas industry for some time and had experience in managing projects, scheduling, estimating, and procurement. *Id.* at 9:4–10; *see* Austin Dep. 63:1–66:10 (extoling Sanders' experience and qualifications at length).

---

[4] Morley testified that even while Rick Phillips was still at C.J. Hughes, she believed herself to be Austin's "report." Morley Dep. 33:9–14.

Morley believed that Sanders was being hired to assist her with business development. *See* Morley Dep. 111:1–6. Sanders testified that at the time he came to C.J. Hughes he was told he would be doing "business development and other duties as assigned based on [his] skill set and prior knowledge." Sanders Dep.  8:17–22.

Irrespective of his job title or duties, Sanders was assigned to report to Morley. Austin Dep. 12:14–16. Yet, despite being Morley's supervisee, at some point, Morley learned that she was being paid substantially less than Austin. Morley Dep. 144:21–24. The parties dispute the size of the pay "disparity." Comparing Defendants' discovery responses, which indicate that Sanders was paid $2,350 per week, to Morley's offer letter, indicating that she was to receive $1,826.92 per week, the resulting salary difference was $523.08 per week, or $27,200.16 per year. *See* C.J. Hughes' Resp. to Pl.'s First Set of Disc., ECF No. 120-10, at 2–3; Offer Letter.

Morley complained about the pay differential to Charles Crimmel, the CFO of ESA, and Reynolds around April or May 2022. *See* Morley Dep. 145; Crimmel Dep. 69:15–21.

**Riddle Investigation and Morley's Reassignment**

In May 2022, an employee of a separate ESA subsidiary complained of sexual harassment by ESA's Chief Operating Officer Neil Riddle. *See* Morley Dep. 173:2–19. Morley testified that Reynolds came to her and disclosed the allegations that had been lodged against Riddle. *Id.* at 173:19–174:17. Morley shared that she had text messages that might substantiate the employee's allegations. *Id.*at 174:7-24. Reynolds decided that they needed to have a formal conversation about those text messages and asked Morley if she wanted to have anyone else present; Morley suggested Austin. *Id.* at 176:9–18. The three individuals met on May 13, 2022, and "talked about the text messages in detail." *Id.* at 176:9–18, 180:9-11; Reynolds Dep. 46:4–9.

After the meeting, Morley received a "very nice text message" from Austin saying that she had "handled [herself] well," and inviting her to "speak up" in the future if she wanted Austin or Reynolds to "engage" if she felt that "someone is getting to close to the line." Morley Dep. 178:16–18; 180:1–6; Text Messages, ECF No. 120-13. Additionally, Reynolds called Morley to thank her for her participation in the Riddle investigation. Morley Dep. 181:1–8.

Riddle was terminated shortly thereafter. *Id.* at 181:9–11. Morley claims that immediately after Riddle was terminated, Austin's behavior toward her changed and that he began shutting her out. *Id.* at 181:12–186:8.

Then, Morley was reassigned. Instead of reporting directly to Austin, the President of C.J. Hughes, Morley was made to report to C.J. Hughes' new hire, Ralph Long.[5] Long was two steps down the corporate ladder. *See* Morley Dep. 118: 8–15 (testifying that Long reported to someone else who reported to Austin).

Defendants submit that the reassignment was an idea that Long came up with while on a business trip in Texas. *See* Long Dep 22:1-23; 120-12. Still, even if the suggestion of Morley's reassignment was Long's, Austin approved it.

Morley testified that after she was assigned to Long, her communication with Austin ceased. Morley Dep. 110:1–6. While she characterizes the reassignment as a demotion, she concedes that her title, pay, and benefits did not change. *Id.* 125:18–23.

---

[5] Long was hired by C.J. Hughes in April of 2022 to serve as a "senior construction specialist." Austin Dep. 61:6–10. Long had significant experience in the construction industry. *Id.* at 61:11–62:1; Morley Dep. 114:1–115:19. Morley agreed that Long had contacts in the industry that she did not have and that the two of them would be working together in business development. *Id.*

**Discriminatory Commentary from Austin**

In addition to the foregoing, Morley alleges that Austin made a litany of inappropriate and sexist comments to, or about, her. Those comments included the following:

- The problem with Morley is "what's between her legs."

- "I wish you were 4'3 and 250 pounds and not a distraction."

- "As long as I am President at CJ Hughes, I will never promote you. My successor can do that."

- "MacKenzie needs a new chastity belt. I suspect it has been breached."

- "That's why you never hire a woman."

- "You need to prove yourself to be able to sit at the table with the big boys."

- "You have my leadership team and customers by the balls and there is nothing I can do about it."

*See* Morley Dep. 367–68. C.J. Hughes admitted that Austin made several of these comments. *See* C.J. Hughes' Resps. To Pl.'s First Reqs. for Admission, ECF No. 122-6. Indeed, some of his comments were made in the presence of others. *See, e.g.*, Crimmel Dep. 56:17–19. While Morley suggests that she reported these comments in or around April or May 2022, *see* Pl.'s Resp. in Opp. at 14, ECF No. 125, the evidence provided to the Court shows that her May reporting was regarding her displeasure with Sanders' pay and Austin "freezing her out," not Austin's sexist comments, *see* Crimmel at 73:6–18.

In fact, the first demonstrable account of Morley reporting Austin's comments was a July 29, 2022 email she sent to Reynolds. *See* July 29, 2022 Email, ECF No. 120-18. Upon receipt, or shortly thereafter, Reynolds forwarded the letter to counsel and C.J. Hughes initiated an internal investigation. On September 2, 2022, Ryan Taylor, C. J. Hughes' Director of Human Resources, sent Morley's attorney a letter with the outcome of that investigation:

> Although [the third-party investigator] concluded that Mr. Austin's conduct did not violate any law, as a result of the investigation, we are taking this opportunity to ensure that our managers at CJ Hughes develop their communication skills with employees. To that end, such managers will be undergoing training on appropriate workplace communication skills.
>
> Additionally, notwithstanding the fact that Mr. Sheets concluded Mr. Austin engaged in no legal wrongdoing, we recognize that Ms. Morley does not wish to report to Mr. Austin. To accommodate this, she will continue to report to Mr. Long while she performs the same duties she was hired to perform. She may also like to know that, while she will be working in the new CJ Hughes building, Mr. Austin will not.

Sep. 2, 2022 Letter, ECF No. 120-19.

The same day she received this letter from Taylor, Morley filed her lawsuit. Compl., ECF No. 1. Her Complaint was amended, as of right, on December 12, 2022. Am. Compl., ECF No. 10. The Amended Complaint alleged four causes of action against ESA and C.J. Hughes: (I) hostile work environment based on gender in violation of the West Virginia Human Rights Act; (II) retaliation for reporting improper/illegal workplace activity in violation of the West Virginia Human Rights Act; (III) outrage (otherwise known as intentional infliction of emotional distress); and (IV) negligent infliction of emotional distress. *Id.* On May 3, 2023, this Court entered a memorandum opinion and order, which dismissed Morley's claims for "Outrage" and Negligent Infliction of Emotional Distress. Order, ECF No. 50.

**Mountwest Community College Utility Construction Program, Morley's Termination**

During her time at C.J. Hughes, in order to address challenges with workforce development, Morley helped establish a "Utility Construction Program" at Mountwest Community College. The program was intended to serve as "a pipeline for talent" into C.J. Hughes. Morley Dep. 315:18–319:13.[6] On behalf of C.J. Hughes, Morley worked through the grant process with

---

[6] Austin referred to the Mountwest project as a "joint venture" with the community college. Austin Dep. 33:24. Morley has since adopted this characterization.

Mountwest and assisted with recruiting students. *Id.* Once the program was established, Morley was designated the "Program Coordinator" for its first year of operation. Dr. Wood Dep. 10:13–16. Morley was not the only C.J. Hughes employee involved in the Mountwest program. The company's HR Director, Ryan Taylor, developed curriculum and taught classes. *See id.* at 41:16–42:15.

Morley was deposed by Defendants on March 27, 2023. During her deposition, Morley testified that she received approximately $48,800 from Mountwest for her work on the Utility Construction Program in 2022. *See* Morley Dep. 318:23–319:8. Morley was paid this amount by Mountwest directly even though she worked on the program during the normal business hours for which she was being paid by C.J. Hughes. *See* Morley Dep. 320:18–21. Morley's salary from C.J. Hughes was not offset by the sums she received from Mountwest.

Ultimately, the facts surrounding Morley's receipt of money from Mountwest are disputed. Morley claims that C.J. Hughes was aware that she was being paid by Mountwest because she was named the Program Coordinator and the grant specifically allotted monies for the individual in that role. Morley Aff. ¶¶ 4–5. Additionally, Morley notes that there was a March 9, 2022, email from Dr. Wood, the Mountwest employee responsible for the Utility Construction Program, to Taylor which referenced, albeit briefly, that Morley being paid by the college. Mar. 9, 2022, Email, ECF No. 122-15. Finally, Morley points to the testimony of Dr. Wood, who stated that Taylor knew Morley was being paid. Dr. Wood Dep. 57:1–8. As mentioned before, Taylor serves as C.J. Hughes' Director of Human Resources.

Defendants deny having prior knowledge about Morley's pay arrangement. For example, Reynolds testified that he did not know Morley was being paid by Mountwest at all until early

2023. *See* Reynolds Dep. 70:19–73:15. Instead, he alleges that she took steps to hide her contract with Mountwest from C.J. Hughes.[7]

At her March 2023 deposition, Morley was asked whether C.J. Hughes knew she was receiving $48,000 from Mountwest, and she responded, "I don't know if they know exactly what I was making." Morley Dep. 319:12–13. Morley was not asked *whether* C.J. Hughes knew she was being paid by Mountwest at all.

On June 20, 2023, Defendants took the deposition of Mountwest officials, and Morley was terminated by C.J. Hughes the following day. Termination Letter, ECF No. 122-12. The letter provided, in pertinent part,

> Based on the information we learned at the depositions of Mountwest officials regarding your gross misconduct that violates our trust, your duty of loyalty to the company, as well as our Code of Conduct, your employment with C. J. Hughes is hereby terminated effective immediately.

*Id.* The letter was signed by Long.

Although Reynolds acknowledged that he personally investigated Morley's receipt of payment from Mountwest, he insisted that he simply provided the results of his investigation to Long and that Long made the decision to terminate Morley. Reynolds Dep. 70:9–76:1. Yet, Taylor testified as C.J. Hughes' 30(b)(6) witness that Reynolds and Long jointly made the decision that Morley had violated C.J. Hughes' policy. *See* Taylor 30(b)(6) Dep. 20:3–22.

---

[7] These steps include Morley signing a contract with Mountwest in the name of a newly established business, "doctoring" a copy of a grant proposal to remove the information relating to payment of the program coordinator, and failing to disclose earnings from Mountwest in early discovery responses. Before the Court, Morley specifically disputed ever "doctoring" the grant proposal. Instead, she argues that he was told by Austin to remove the number from the version of the grant they were sending to the union. Morley has not provided a clear explanation for these other suspicious circumstances.

A week later, on June 28, 2023, Morley moved for leave to file a Second Amended Complaint to include allegations regarding her termination. Mot. for Leave, ECF No. 75. Noting that Defendants stated that they did not object to Morley's motion, the Court granted Morley's motion for leave on July 12, 2023. Order, ECF No. 79.

The Second Amended Complaint added Defendant Doug Reynolds as an adverse party and includes the following causes of action: (I) hostile work environment based on gender in violation of the West Virginia Human Rights Act; (II) retaliation for reporting improper/illegal workplace activity in violation of the West Virginia Human Rights Act; and (III) wrongful discharge in violation of substantial public policy under West Virginia common law.[8]

Defendants have moved for summary judgment on all counts of Morley's Second Amended Complaint. Morley has cross-moved for summary judgment on Counts II and III.[9]

## II.  LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[8] The Second Amended Complaint originally included a fourth cause of action for "tortious interference with advantageous relations" *See* Second Am. Compl. ¶¶ 115–19. Defendants moved to dismiss that count, and Morley did not oppose its dismissal. *See* ECF No. 94; ECF No. 103. Accordingly, Count IV was dismissed by the Court on August 10, 2023. Order, ECF No. 105.

[9] The Court notes that although Morley's motion is titled "Plaintiff's Motion for Summary Judgment on Counts II and III of Second Amended Complaint," her memorandum of law is titled "Plaintiff's Memorandum in Support of Motion for Summary Judgment on Count Three of Amended Complaint (Retaliation for Filing this Civil Action)." Notwithstanding the titles of these documents, the Court accepts that Morley's has moved for summary judgment against the all Defendants for retaliatory termination in violation of the WVHRA (the second claim in Count II) and against Defendants ESA and Reynolds for common law wrongful termination in violation of substantial public policy (Count III).

249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III. ANALYSIS

**A.  Employers and Persons Liable Under the West Virginia Human Rights Act**

As a threshold matter, Defendants argue that Defendants ESA and Reynolds cannot be held liable under the West Virginia Human Rights Act ("WVHRA"). Specifically, they argue that ESA is not subject to the Act and that there are no factual allegations that would support a claim against Reynolds. The Court disagrees.

Under the WVHRA, an "employer" is defined as "the state, or any political subdivision thereof, and any person employing twelve or more persons within the state for twenty or more calendar weeks in the calendar year in which the act of discrimination allegedly took place or the preceding calendar year[.]" W. Va. Code § 5-11-3(d).

It does not appear to be disputed that ESA employs fewer than twelve persons within the state. *See* ESA Fed. Unemployment Tax Act Rep., ECF No. 120-44 (indicating that ESA has six

-11-

employees). Nevertheless, Morley argues that ESA can be held liable under *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 981 (4th Cir. 1987). In *Johnson*, the Fourth Circuit found "in an employment context, the parent company can be the employer of a subsidiary's workers if it exercises excessive control in one of two ways." *Id.* First, the parent company controls the employment practices and decisions of the subsidiary. *Id.* Second, the parent company dominates the subsidiary's operations, rendering the two companies as one. *Id.*

While Morley has not offered adequate evidence for the Court to conclude that the second *Johnson* situation is appliable to the relationship between ESA and C.J. Hughes, Morley has produced sufficient evidence to create a genuine issue of material fact regarding ESA's control over C.J. Hughes' employment practices and decisions. At this stage, it is apparent that Reynolds, as ESA's President, was regularly involved in C.J. Hughes' employment matters, particularly as they pertained to Morley. He discussed her employment with her and there is no suggestion that he ever told her to direct her concerns elsewhere. *See, e.g.*, Morley-Reynolds Correspondence, ECF No. 125-8. Additionally, he took an active role in investigating her relationship with Mountwest and, viewing the evidence in the light most favorable to Morley, in making the decision to terminate her. *See* Taylor 30(b)(6) Dep. 20:3–22. In the end, it will be up to the factfinder to determine the extent of Reynolds' and ESA's control. *See Laya v. Erin Homes, Inc.*, 352 S.E.2d 93, 102 (W. Va. 1986) ("[T]he propriety of piercing the corporate veil should rarely be determined upon a motion for summary judgment. Instead, the propriety of piercing the corporate veil usually involves numerous questions of fact for the trier of facts to determine upon all the evidence.").

Moreover, liability under the WVHRA is not limited to "employers." Section 5-11-9(7)(B) provides for liability for any "person, employer, employment agency, labor organization, owner, real estate broker, real estate salesman or financial institution" who aids or abets any of the

discriminatory practices prohibited by the Act. *See Holstein v. Norandex*, 461 S.E.2d 473 (W. Va. 1995).

Here, Morley has presented enough evidence to allow a reasonable jury to conclude that Reynolds aided and abetted the hostile work environment alleged by Morley and that he participated in, encouraged, or otherwise influenced her termination. Indeed, Reynolds seems to have placed himself in the middle of C.J. Hughes' employment relationship with Morley, and he took it upon himself to investigate her relationship with Mountwest. As such the Court **DENIES** Defendants' motion based on the argument that ESA and Reynolds cannot be held liable under the WVHRA.

## B.  Count I: Hostile Work Environment Under the WVHRA

To prove a hostile work environment claim, a plaintiff must show:

(1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was "sufficiently severe or pervasive to alter the ... [plaintiff's] conditions of employment and create an abusive work environment"; and (4) it was imputable on some factual basis to the employer.

*Hanlon v. Chambers*, 464 S.E.2d 741, 748–49 (W. Va. 1995) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).[10]

To support her hostile work environment claims, Morley seeks to rely on the sexist comments made by Austin, many of which the Defendants admit Austin said, as well as the pay gap between her, Sanders, and other individuals in C.J. Hughes' management.

As noted by the Court at the motions hearing, Morley cannot properly rely on her claims of pay disparity to support her hostile work environment claims. First and foremost, she did not

---

[10]  It is well established that WVHRA cases "are governed by the same analytical framework and structures developed under Title VII." *Barefoot v. Sundale Nursing Home*, 482, 457 S.E.2d 152, 159 (W. Va. 1995).

plead a sex discrimination claim based on disparate treatment. Second, even if she had, she has failed to establish that Sanders, or any of the other male employees she claims received higher pay, were similarly situated to her. *See Noonan v. Consol. Shoe Co., Inc.*, 84 F.4th 566 (4th Cir. 2023). Accordingly, the Court considers Morley's hostile work environment claim solely as it relates to environment created by Austin's commentary.

Defendants' motion for summary judgment is based on the following arguments: (1) the hostile environment is not imputable on Defendants Reynolds and ESA, and (2) the Defendants are entitled to the "*Faragher-Ellerth* defense."

As to the first argument, the Court has already determined that there is adequate factual evidence for a jury to consider ESA and Reynold's liability under the WVHRA. *See supra* § III(A).

As to the second argument, when a plaintiff has been subjected to sexual harassment, but no tangible employment action is taken related to that sexual harassment,[11] "a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

> The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Id.*

While Morley submits that Austin made sexist remarks directed toward her from the beginning of her employment, the Defendants argue that she did not report Austin's comments until June or July 2022. By that time, she had already been reassigned to Long, and thus was no

---

[11] Importantly, Morley does not specifically allege that there was a tangible employment action related to Austin's sexist comments. Instead, she alleges that she was demoted because of her participation in the Riddle investigation and was terminated because she filed this lawsuit.

longer in a work environment with Austin. Moreover, the Defendants assert that C.J. Hughes promptly conducted an investigation into Morley's allegations. While that investigation found Austin had not acted illegally, the Defendants submit it was prompt and reasonable. The Court agrees.

Even viewing the evidence in the light most favorable to Morley, there is no evidence that Morley reported Austin's sexist comments until she sent a letter to Reynolds in July 2022. However, by that time, she had already been assigned to Long and her communication with Austin had ceased, effectively terminating the hostile environment created by Austin's comments. *See*. Morley Dep. 110:1–6. More importantly, after Morley sent that letter, C.J. Hughes promptly initiated an internal investigation to assess, prevent, or correct any sexually harassing behavior. Sep. 2, 2022 Letter, ECF No. 120-19. Even though the investigation concluded that Austin had not acted unlawfully, C.J. Hughes assured Morley that she would not have to work directly with her alleged harasser. *Id.* Morley has failed to produce any evidence that disputes these facts or to suggest that the hostile work environment continued after this investigation was complete. *See Brown v. Bratton*, No. 21-1998, 2022 WL 17336572, at *11 (4th Cir. Nov. 30, 2022) (finding harassment could not be imputed to an employer when it promptly acted in a way that caused the discriminatory comments to stop). Accordingly, the Defendants' motion for summary judgment is **GRANTED** with respect to Count I of the Second Amended Complaint.

## C. Count II: Retaliation in Violation of the West Virginia Human Rights Act

Like Title VII, the WVHRA prohibits retaliation against an employee "because he or she has opposed any practices or acts forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." W. Va. Code § 5-11-9(7)(C).

Sometimes referred to as the "Opposition Clause," the West Virginia Supreme Court has long held that this clause "prohibits an employer or other person from retaliating against any individual for expressing opposition to a practice that he or she reasonably and in good faith believes violates the provisions of the West Virginia Human Rights Act." Syl. pt. 11, *Hanlon v. Chambers*, 464 S.E.2d 741 (W. Va. 1995).

To establish a prima facie case of retaliation under the WVHRA, a plaintiff must plead and prove (1) she engaged in a protected activity under the Act, (2) the defendant employer was aware of her engagement in the protected activity, (3) the defendant employer took adverse action against her, and (4) the adverse action was retaliatory or, in the absence of evidence establishing retaliatory motive, was sufficiently temporally related to the protected activity so as to allow the Court to infer retaliatory motivation. *See Roth v. DeFeliceCare, Inc.*, 700 S.E.2d 183, 193 (W. Va. 2010) (quoting Syl. pt. 4, *Frank's Shoe Store v. W. Va. Human Rights Comm'n*, 365 S.E.2d 251 (W. Va. 1986)); *Porter v. M.W. Logistics Servs.*, No. 1:18CV122, 2019 WL 4007351, at *7 (N.D.W. Va. Aug. 23, 2019).

Once the prima facie case is established, the burden of production shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse action. *Burke v. Wetzel Cnty. Comm'n*, 815 S.E.2d 520, 533 (W. Va. 2018). After this, the plaintiff is afforded the opportunity to show that the defendant's discriminatory reason is merely pretextual. *Id.*

At the hearing before the Court, Morley made clear that Count II is intended to hold Defendants liable for two separate adverse employment actions: first, her claimed "demotion" via her reassignment to Long in June 2022, and second, her termination in June 2023.[12]

---

[12] Admittedly, because Count II existed in the original and first amended complaints, the Court, and it appears the Defendants, were of the notion that it pertained only to Morley's alleged demotion. Nonetheless, a generous reading of the Second Amended Complaint (in particular

For the purposes of the pending motions, Defendants do not contest the first two elements of Morley's prima facie case. With respect to her reassignment, Defendants argue that that Morley did not suffer an adverse action and that her assignment to Long was not tied to the Riddle investigation. With respect to her termination, they argue that she has failed to show that the reason given for her termination is pretextual.

**Reassignment to Long**

An adverse employment action "constitutes significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hoyle v. Freightliner*, LLC, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

> Material change in duties can constitute an adverse employment action.
>
> To be sure, reassignment of job duties is not automatically actionable. Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) (quoting *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81 (1998)); *see Robinson v. Austin*, 602 F. Supp. 3d 825, 832 (D. Md. 2022) ("[M]inor changes in job responsibilities typically are not actionable."); *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004) ("The mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action."). A plaintiff bears the burden of showing the change had "some significant detrimental effect." *James*, 368 F.3d at 376. "'[A]bsent any decrease in compensation, job title, level of

---

Morley's incorporation of "the previous paragraphs as if set forth herein" in Paragraph 86 and nonspecific damages in Paragraphs 96 and 100), allows the Court to conclude that Count II contains statutory retaliation claims relating both to Morley's alleged demotion and termination.

responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position.'" *Id.* (quoting *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999)).

While her title and pay did not change, Morley argues that the reassignment "clearly reflected Defendants' prevailing attitude that she was not equal with the other males in their management, and [that she] required special supervision." Pl.'s Resp. in Opp, at 17. The reassignment, she argues, "represented a loss of prestige, and another reminder that she would never receive fair treatment as a woman working in the male-dominated construction business." *Id.*

While it is a close case, the Court finds there is enough evidence for a jury to conclude that the reassignment was adverse. Despite being hired to report directly to the company's president, Morley was reassigned to someone two rungs down the supervisory chain. She was moved away from those in management, and in a small company like C.J. Hughes, such a reassignment may be viewed as a signal to others that Morley was no longer within the core management team. Moreover, Morley argues that in conjunction with this reassignment, Austin made comments suggesting that she would never be promoted while he was President of the company.

Additionally, Morley has demonstrated that her reassignment to Long was sufficiently temporally linked to her participation in the Riddle investigation and Riddle's subsequent termination. Defendants argue that Morley's reassignment was Long's decision, that it was temporally linked to a company trip to Texas, and that there is "undisputed evidence that both ESA and CJH were grateful for Plaintiff's cooperation" in the Riddle investigation. Defs.' Mem. of Law, ECF No. 123, at 26–27. Long's testimony notwithstanding, Morley has shown a close

temporal link between her participation in the Riddle investigation and her reassignment. It will ultimately be up to a jury to decide whether Long and Austin's testimony is credible.

Furthermore, the Court is hesitant to find, as a matter of law, that an employer's statement thanking an employee for participating in a protected activity are sufficient to defeat a retaliation claim, even when an adverse action closely follows.

As such, Morley may present her demotion claim to a jury.

**Morley's Termination in 2023**

There is no question that Morley's termination was an adverse employment action, and Defendants do not argue as much. Instead, they argue that there was legitimate non-discriminatory reason for Morley's termination and that she has failed to produce sufficient evidence that their reason for termination was pretextual.

"Pretext may be shown through direct or circumstantial evidence of falsity or discrimination." *Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152, 160 (W. Va. 1995) (citing *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255–56 (1981)). The West Virginia Supreme Court of Appeals has made clear that "a finding of pretextuality allows a juror to reject a defendant's proffered reasons for a challenged employment action and, thus, permits the ultimate inference of discrimination." *Id.* Therefore,

> unless the employer comes forward with evidence of a *dispositive*, nondiscriminatory reason as to which there is no real dispute and which no rational trier of fact could reject, the conflict between the plaintiff's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial.

*Id.* at 164 n.19 (emphasis in original) (internal quotation marks and citation omitted); *Knotts v. Grafton City Hosp.*, 786 S.E.2d 188, 199 n. 13 (W. Va. 2016).

Here, Morley has placed Defendants' proffered legitimate nondiscriminatory reason for her termination in dispute. Indeed, should the jury believe Morley's evidence, it could conclude that Defendants knew she was receiving moneys from Mountwest a year or more before her termination.

Therefore, viewing the evidence in the light most favorable to Morley, the Court finds that a reasonable juror could determine that both Morley's reassignment to Long was an adverse action that was temporally linked to her participation in a protected activity and that the reason Defendants provided for her termination was pretextual. Additionally, Morley has presented sufficient evidence for a jury to conclude that ESA and Reynolds were involved in her termination. Accordingly, Defendants' motion for summary judgment as to Count II of the Second Amended Complaint is **DENIED.**[13]

Likewise, viewing the evidence in the light most favorable to the Defendants, a reasonable juror could determine that Morley was terminated for her disloyalty and failure to disclose her dealings with Mountwest. As such, Morley's motion for summary judgment on Count II is **DENIED**.

---

[13] Morley argues that the "after-acquired evidence doctrine" entitles her to judgment as a matter of law. *See, e.g.*, ECF No. 123, at 17–18. Under this doctrine, "the employer argues that it has acquired evidence since the time of the earlier wrongful 'action that, had it known it at the time, would have led it to do exactly what it did, except for a legitimate reason rather than an illegal one.'" *Miller v. AT & T*, 83 F. Supp. 2d 700, 704 (S.D.W. Va. 2000), *aff'd sub nom. Miller v. AT & T Corp.*, 250 F.3d 820 (4th Cir. 2001) (quoting *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1237 (4th Cir. 1995)). When employed, the doctrine allows the employer to limit a plaintiff's right to backpay to the date between the wrongful employment action and the date the new information was discovered. *See McKennon v. Nashvill Banner Publ'g Co.*, 513 U.S. 352, 362 (1995). This doctrine does not, however, prevent an employer from terminating an employee who has engaged in a protected activity for legitimate, nondiscriminatory reasons.

**D.  Count III: Common Law Retaliatory Discharge[14]**

West Virginia recognizes a common law recognizes that "[t]he rule than an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge." Syl. *Harless v. First Nat'l Bank in Fairmont*, 246 S.E.2d 270 (W. Va. 1978).

The Supreme Court of Appeals of West Virginia has provided four elements necessary to state a claim for retaliatory discharge:

> (1) That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element);
> (2) That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element);
> (3) That plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element);
> (4) The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Herbert J. Thomas Mem'l Hosp. Ass'n v. Nutter*, 795 S.E.2d 530 (W. Va. 2016) (citations omitted) (italicization original) (providing these factors as a summary of the four factors announced by Justice Davis in *Feliciano v. 7-Eleven, Inc.*, 559 S.E.2d 713 (W. Va. 2001)).

Morley submits that there are two separate substantial public policies underlying her *Harless* claim. First, Morley argues that it is against substantial public policy of West Virginia to discharge an employee because the employee has given truthful testimony in a legal action. Second Am. Compl. ¶ 104 (citing *Page v. Columbia Nat'l Res.*, 480 S.E.2d 817 (W. Va. 1996)).

---

[14] Morley has made clear that Count III is asserted only against Defendants ESA and Reynolds. *See* Pl.'s Resp. in Opp. at 17 n.5.

Second, she argues that her termination violated the substantial public policies set forth in the West Virginia Human Rights Act. *Id.* at ¶ 107.

While not substantially briefed on their motion for summary judgment or their response to Morley's motion, before the Court Defendants argued that ESA and Reynolds cannot be held liable under *Harless* because they did not have an "employer-employee" relationship with Morley.

Importantly, the term "employer" is not defined in *Harless*. Without caselaw suggesting otherwise, the Court sees no reason why the same mechanisms of piercing the corporate veil described in *Johnson* would not apply to this case. Inasmuch the Court has already determined that a jury should decide whether ESA sufficiently controlled C.J. Hughes' employment decisions to pierce the corporate veil, *see supra* § III(A), the Court finds it is not entitled to summary judgment based on this argument.

On the other hand, Morley has not provided, and the Court has not located, any case law suggesting that aider and abettor liability recognized by the WVHRA attaches to *Harless* claims. As such the Court finds that Reynolds is entitled to summary judgment on this Count based on his lack of employer-employee relationship with Morley.

With that matter settled, the Court turns to the substantial public policies cited by Morley.

**Retaliation for Testifying**

"Basic to the administration of justice is the search for the truth." *Page*, 480 S.E.2d at 825. As such, the West Virginia Supreme Court of Appeals held in *Page* that "a reasonable employer should be aware that any attempt to interfere with the process of obtaining truthful testimony, by either intimidating a potential witness/employee prior to his or her testimony or retaliating against such witnesses/employee thereafter, violates the clear and substantial public policy of this State." *Id.* at 825–26.

Defendants ESA and Reynolds argue that Morley's *Harless* claim premised on the substantial public policy set forth in *Page* must fail because Morley was not terminated based on her testimony and there was an overriding business justification for Morley's discharge. *See* Defs.' Mem. of Law. at 27.

The Court agrees that Morley has failed to produce sufficient evidence regarding causation. First, there is no strong temporal connection between Morley's deposition testimony and her termination three months later. Second, and more importantly, Morley's briefing makes clear that she believes Defendants' decision to terminate her was more temporally related to the deposition testimony of Marshall Reynolds on May 10, 2023 than to her own deposition in March. *See* Pl.'s Mem. in Supp. at 6 ("It was clear that Defendants sought to terminate Plaintiff following the deposition of Marshall Reynolds."). Finally, Morley's briefing consistently proclaims that she was fired not because she gave truthful testimony but "because she filed this civil action." *See id.* at 16; Pl.'s Reply to Defs.' Resp. 2, ECF No. 126, Pl.'s Reply to Defs.' Resp. 10 ("Defendants' shifting reasons for their actions against Ms. Morley reveal pretexts seeking to mask their obvious retaliation against her for pursuing this action."). At bottom, Plaintiff may not use the substantial public policy set forth in *Page* to repackage her statutory claim in Count II.

Accordingly, the Court finds that the Defendants ESA and Reynolds are entitled to judgment as a matter of law on Morley's common law retaliatory discharge claim based on the public policy set forth in *Page*.

**Common Law Retaliation Based on the Substantial Public Policy in the WVHRA**

In addition to the substantial public policy set forth in *Page*, Morley argues that her termination violated the public policies embodied in the WVHRA. *See* Second Am. Compl. ¶ 107; Pl.'s Resp. in Opp. at 17–18. While the West Virginia Supreme Court of Appeals has permitted

*Harless* claims based on the substantial policy set forth in the WVHRA in cases where the employer is not subject to the Act, *see* Syl. pt. 8, *Williamson v. Greene*, 490 S.E.2d 23 (W. Va. 1997), the Court has already determined that Morley may proceed on her statutory claim for wrongful termination against ESA and Reynolds. Therefore, she may not maintain a separate cause of action against them under *Harless*. *See Edmonds v. Altice Tech. Servs. US LLC*, 413 F. Supp. 3d 488, 493 (S.D.W. Va. 2019).

As such, Defendants' motion for summary judgment is **GRANTED** as to Morley's common law retaliatory discharge claims in Count III of the Second Amended Complaint. Accordingly, Plaintiff's motion for summary judgment on this Count is **DENIED**.

## IV. CONCLUSION

Accordingly, for the foregoing reasons, the Court **ORDERS** follows:

(1) the Motion for Summary Judgment by Defendants Energy Services of America Corp., CJ. Hughes Construction Co., and Douglas V. Reynolds (ECF No. 120) is **GRANTED in part and DENIED in part**. The Motion is granted to the extent that Counts I and III of the Second Amended Complaint are dismissed; the Motion is otherwise denied.

(2) Plaintiff's Motion for Summary Judgment on Counts II and III of Second Amended Complaint (ECF No. 122) is **DENIED**.

(3) The parties must submit any remaining motions in limine within **seven days** of the Court's entry of this order.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:   January 3, 2024

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE